Marc P. Berger
Sanjay Wadhwa
Judith Weinstock
Christopher J. Dunnigan
Alison Conn*
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0061 (Dunnigan)
* not admitted in the U.S. District Court for the S.D.N.Y.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | 19 Civ. 5895   (UA) |
| | : | |
| Plaintiff, | : | COMPLAINT |
| | : | |
| v. | : | |
| | : | |
| DONALD S. LAGUARDIA, JR. | : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : | |
| | : | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges the

following against defendant Donald S. LaGuardia, Jr. ("LaGuardia" or "Defendant"):

## SUMMARY OF ALLEGATIONS

1.       Beginning in at least 2013 and continuing to at least May 2017, LaGuardia, who

controlled the unregistered investment adviser L-R Managers, LLC ("L-R Managers" or the

"Firm"), perpetrated a three-pronged scheme to defraud private investment funds, which were

managed by the Firm, and the funds' investors.  First, LaGuardia misappropriated approximately

$2.62 million from the LR Global Frontier Master Fund, Ltd., and two feeder funds (collectively,

the "Frontier Funds" or the "Funds"), which ostensibly were formed to invest in frontier markets

and concealed part of this misappropriation through a sham receivable and promissory note. Second, LaGuardia and the Firm misstated, or directed others to misstate, the Net Asset Value ("NAV") and returns of the Funds through other fraudulent accounting devices. Finally, LaGuardia and L-R Managers made material misrepresentations about the Funds' audits, expenses and performance to investors and prospective investors.

2.  As the first part of his fraudulent scheme, LaGuardia transferred or directed others to transfer approximately $1.25 million from the Funds' accounts to L-R Managers' bank account and to another account to repay a debt of L-R Managers. LaGuardia then disguised the misappropriation and inflated the NAV of the Funds by directing the creation of a receivable "due from" L-R Managers and a promissory note also "due from" the Firm.

3.  In addition, LaGuardia diverted or directed others to divert approximately $1.37 million designated as an investor's Frontier Fund subscriptions to L-R Managers' bank account and to a Fund account of an entity affiliated with L-R Managers, rather than in an account for that investor. LaGuardia used the money to pay for unauthorized Firm and personal expenses, including $300,000 which was used to pay for his home renovations. An approximate summary of misappropriated investor funds is as follows:

| | |
|---|---|
| Unauthorized transfers from Funds' accounts | $1.25 million |
| Investor's subscription funds diverted | $1.37 million |
| **Total investor funds misappropriated** | **$2.62 million** |

4.  Of the approximately $2.62 million that LaGuardia misappropriated, he directed approximately $590,000 to himself: the majority of this money was transferred to his bank account and to a vendor for his personal benefit. The remainder of the money that LaGuardia

misappropriated was used to pay L-R Managers' expenses, such as rent and salaries, which, pursuant to the terms of the Funds' offering documents, should have been paid by the Firm.

5.      As a second part of the scheme, in addition to the misappropriation of approximately $2.62 million, LaGuardia directed that more than $830,000, amounts that had been recorded as Fund expenses, be reversed and accounted for as another receivable "due from" L-R Managers, further artificially inflating the NAV of the Funds.  Also, beginning in 2016, LaGuardia and the other Managing Principal of L-R Managers decided to increase the Funds' monthly income by the amount of a hypothetical performance gain or "true-up" reflecting the difference between the portfolio as invested and the portfolio as it had previously been invested. These hypothetical gains were also recorded as a receivable "due from" L-R Managers.  By September 2016, these hypothetical gains had accumulated to more than approximately $400,000 and served to artificially inflate the NAV of the Funds.

6.      In total, as of September 30, 2016, the amount "due from" L-R Managers to the Funds amounted to approximately $2 million, which was approximately 74% of the purported value of the Funds' total NAV of approximately $2.7 million.

7.      Finally, LaGuardia and L-R Managers made material misrepresentations about the Funds' audits, expenses and performance to investors and/or prospective investors in connection with their investments and/or prospective investments in the Funds.

8.      By this action, the Commission seeks, among other things, permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest thereon, and civil monetary penalties.

## VIOLATIONS

9.      By virtue of the conduct alleged herein, Defendant, directly or indirectly, has engaged, and unless restrained and enjoined will again engage in acts, practices, schemes and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)], and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder.  In addition, LaGuardia is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for L-R Managers' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10.      Unless permanently restrained and enjoined, Defendant will again engage in the acts, practices, transactions and courses of business set forth in this Complaint and in acts, practices, transactions and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11.      The Commission brings this action pursuant to the authority conferred on it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

12.      The Commission seeks a final judgment permanently enjoining Defendant from committing violations of the securities law provisions that Defendant violated as alleged in this Complaint, ordering Defendant to disgorge his ill-gotten gains and pay prejudgment interest thereon and to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15

U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section

209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(e) and 80b-9(f)].

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action, and venue lies in this District,

pursuant to Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v],

Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa], and Section 209(d) of the

Advisers Act [15 U.S.C. § 80b-9(d)].  Certain of the events constituting or giving rise to the

alleged violations occurred in the Southern District of New York.  For instance, L-R Managers

had its principal place of business in New York, New York.

14.     In connection with the conduct alleged in this complaint, Defendant, directly or

indirectly, has made use of the means or instruments of transportation or communication in, and

the means or instruments of, interstate commerce, or of the mails, or of the facilities of a national

securities exchange.

## DEFENDANT

15.     LaGuardia, age 52, resides in Lavallette, New Jersey.  LaGuardia was one of the

founders of, and controlled, L-R Managers: he served as Chief Executive Officer and one of two

Managing Principals of the Firm which, beginning in 2010, was the investment adviser to the LR

Global Frontier Master Fund, Ltd. ("Master Fund") and two feeder funds, the LR Global Frontier

Fund, Ltd. (the "offshore Frontier Fund") and the LR Global Frontier Fund LP (the "onshore

Frontier Fund").  LaGuardia was also a portfolio manager of the Frontier Funds.  LaGuardia

received a Certified Public Accountant designation.  According to LaGuardia's biography in

marketing and offering material for the Frontier Funds, he received a Masters in Business

Administration ("MBA") from New York University.  In fact, however, LaGuardia never received such a degree.

## RELEVANT ENTITIES

16.     **L-R Managers or the Firm**.  Beginning in 2010, L-R Managers was the investment adviser to, among other clients, the Frontier Funds.  The Firm was not registered with the Commission.  L-R Managers had its principal place of business at 430 Park Ave., New York, New York.  On June 7, 2017, L-R Managers filed for Chapter 7 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York.

17.     **The Frontier Funds or Funds.**  The Frontier Funds were structured as a Master Fund with two feeder funds.  The onshore feeder, LR Global Frontier Fund LP, was a Delaware limited partnership; the offshore feeder, LR Global Frontier Fund, Ltd., was an exempted company incorporated under the laws of the Cayman Islands.  According to the Private Placement Memorandum ("PPM") for the onshore fund, LaGuardia was one of two managing members of the general partner of the Fund having "ultimate responsibility for the management, operations and the investment decisions made on behalf of the Partnership."  Beginning in at least 2013, both the onshore and offshore Frontier Funds offered three separate classes, each with a purportedly different frontier market investment strategy.  According to the PPMs for both the onshore and offshore Frontier Funds, however, each Frontier Fund was a single legal entity and thus each class could be compelled to bear the liabilities of the other classes.

## FACTS

**I.    LaGuardia Misappropriated Fund Assets and Concealed Part of the Misappropriation Through a Sham Receivable and Promissory Note**

18.    Beginning in at least 2013, LaGuardia and others at L-R Managers were soliciting investors for the Frontier Funds; between 2013 and 2015, they raised at least $6 million from fewer than a dozen investors.

19.    From at least 2013, LaGuardia misappropriated approximately $2.62 million in Frontier Fund assets and money that was designated as Frontier Fund subscriptions.  The misappropriation took two forms:  first, beginning in at least 2013, LaGuardia transferred and/or directed others to transfer approximately $1.25 million from the Frontier Fund accounts to accounts owned by or for the benefit of L-R Managers.  LaGuardia used the $1.25 million that he misappropriated from the Funds to pay both personal expenses and Firm expenses which were not authorized by the Funds' offering documents.  Second, as set forth in paragraphs 43 to 47 below, LaGuardia misappropriated approximately $1.37 million that was designated as an investor's Frontier Fund subscriptions.  Of the approximately $2.62 million in misappropriated money, LaGuardia directed that approximately $590,000 be transferred or withdrawn from L-R Managers' bank account and either deposited to his personal account or to a vendor in connection with his home renovations.

20.    In order to conceal the misappropriated $1.25 million used for personal and Firm expenses, LaGuardia directed others to record the misappropriated amounts as a receivable "due from" L-R Managers to the Funds on the Funds' accounting records and as a promissory note documenting a purported loan from the Funds to the Firm.  Specifically, LaGuardia papered approximately $201,500 of this $1.25 million of misappropriated money as a promissory note between the Master Fund and L-R Managers, LLC dated October 28, 2014 which was executed

by LaGuardia and allegedly accrued a "finance charge" of 10% annually.  LaGuardia directed

that the note be recorded as a holding of the Funds as of approximately October 31, 2014;

accrued interest totaling almost $40,000 was recorded as income to the Funds.  The initial note

had a maturity of June 30, 2015 but was not repaid on that date or subsequently.  Instead,

LaGuardia executed extensions on the maturity date of the note and, finally, in May 2017, L-R

Managers asked the fund administrator to write-off the note.

21.     As LaGuardia knew or was reckless in not knowing, the receivable and the

promissory note served to conceal that money had been misappropriated from the Funds.

22.     As LaGuardia knew or was reckless in not knowing, the Frontier Fund PPMs do

not include a provision permitting the Firm to take loans from the Funds.  In addition, such

transactions constituted a conflict of interest with the Funds which was not disclosed to

investors.

**II.     LaGuardia Used Other Fraudulent Accounting Devices to Inflate the NAV and Returns**

23.     In addition to the receivable related to the misappropriation and the promissory

note, LaGuardia and L-R Managers used, or directed others to use, at least two other accounting

devices to inflate the NAV of the Funds as well as the capital account balances and returns

reflected on investors' statements, including a sham receivable for the Funds' expenses and a

performance "true-up."  As LaGuardia knew or was reckless in not knowing, these accounting

devices collectively rendered the capital account balances and returns reflected on investors'

account statements and other documents false and misleading.

1. **Reversal of Fund Expenses and Recording of Sham Fund Expense Receivable**

24.     Beginning in at least 2013, LaGuardia and L-R Managers instructed that amounts that had been recorded as Frontier Fund expenses not be deducted from the Funds' profits but rather, be booked as another receivable due from L-R Managers on the Funds' accounting records.

25.     By September 2016, this Fund expense receivable artificially inflated the NAV of the Funds' by more than approximately $830,000.

26.     As LaGuardia knew or was reckless in not knowing, if the Firm had incurred and paid the Funds' expenses out of Fund assets and not recorded these expenses as a receivable, the Funds' NAV, performance numbers, as well as the capital account balances and returns reported to investors would have been substantially lower.

2. **Overstated Returns Through a Performance "True-Up"**

27.     Further, beginning in January 2016, LaGuardia and the other Managing Principal of L-R Managers decided to record hypothetical gains or what the Firm referred to as a performance "true-up." When the Frontier Funds changed custodians at or around the end of 2015, L-R Managers allegedly had to liquidate a large portion of their portfolio rather than transfer the securities to the new custodian. For the months January 2016 through September 2016, L-R Managers calculated a month-end performance "true-up" or an amount that was equal to the difference in the actual asset value and a hypothetical asset value assuming the securities had remained invested in the securities that the Funds held at the end of 2015. On a monthly basis, the amount of the performance "true-up" was recorded as income to the Funds and as a receivable due from L-R Managers.

9

28.     By September 2016, the cumulative effect of the performance "true-up" artificially inflated the NAV of the Funds by more than $400,000.

**III.     Misrepresentations Regarding Audits, Expenses and Performance**

29.     Investors, and prospective investors, including Investor A below, received PPMs, Quarterly Newsletters, and other documents from L-R Managers and LaGuardia.  Certain investors, including Investor A below, also received "Net Capital Account Summaries" created by the Firm.  Investors also received, or were provided online access to, account statements provided by the Funds' administrators.

30.     The PPM for the offshore Fund states that "[i]n consideration for the Management Fee, the Investment Manager will provide office space and utilities …clerical and other personnel to the Fund.  The Investment Manager will bear the costs of providing such goods and services, and all of its own overhead costs and expenses...." and that "expenses paid by the Fund (other than the Management Fee) will be charged pro rata to the shareholders...."  The language in the onshore PPM is, in substance, the same except that it states that the investment expenses relating to specific classes "will generally be charged only against" those capital accounts "pro rata in accordance with their interests therein...."

31.     As LaGuardia knew or was reckless in not knowing, his misappropriation of Frontier Fund assets and the improper classification of Frontier Fund expenses rendered the expense disclosures in the PPMs false and misleading.

32.     The PPMs also state that an independent firm had been retained to audit the Frontier Funds and that investors in the feeder funds would receive audited financial statements.

33.     In fact, as LaGuardia knew or was reckless in not knowing, an audit firm was not engaged for the Frontier Funds and no audited financials were prepared or provided to investors.

35.     LaGuardia and L-R Managers provided Frontier Fund performance numbers to investors and prospective investors in Quarterly Newsletters, "Net Capital Account Summaries" and other documents.  As LaGuardia knew or was reckless in not knowing, these performance numbers were inflated.  In addition, in some of these documents, L-R Managers represented that the returns were "net of all fees and expenses" which, by virtue of the Fund expense receivable, was false and misleading.

**IV.    Investor A – Misappropriation of Approximately $465,000**

36.     LaGuardia met with a prospective investor, Investor A, in or about July 2015.  At or around that time, Investor A received a PPM for the onshore Frontier Fund.  A few weeks later, LaGuardia emailed Investor A the subscription documents for the onshore Frontier Fund as well as a document which contained purported performance numbers for the Funds.

37.     At the time LaGuardia provided these documents to Investor A, no audit firm had been engaged to audit the Funds, no audited financials had been prepared or provided to investors, and the expense disclosures in the PPM were false and misleading.  In addition, in materials provided to Investor A by LaGuardia and/or L-R Managers, the historical performance of the Frontier Funds was inflated.

38.     In addition, LaGuardia made an oral misrepresentation to Investor A related to Fund expenses.  Prior to Investor A's subscription, LaGuardia falsely told this investor that L-R Managers would bear the start-up costs of the Funds until the Funds had sufficient assets under management so that Investor A would not be disadvantaged by having to pay those costs.  In fact, as LaGuardia knew or was reckless in not knowing, the Frontier Funds had historically paid the expenses of not only the Funds, but also expenses of the Firm, as described above.

39.     In or about September 2015, Investor A made an approximately $2 million subscription in the onshore Frontier Fund through a joint account with his wife.  Unknown to Investor A, at the time of his subscription, more than 50% of the approximately $2 million NAV of the Funds was comprised of sham receivables and the promissory note due from the Firm.

40.     After Investor A's money was received into the Frontier Fund accounts, LaGuardia continued his practice of misappropriating money from the Funds to pay for Firm and personal expenses.

41.     From October 30, 2015 through February 19, 2016 a total of approximately $465,000 was transferred from the Funds' accounts to the L-R Managers bank account and was used to pay unauthorized Firm and personal expenses, including, for example:

- approximately $93,000 paid directly to LaGuardia, and an additional $40,500 used by LaGuardia to repay a personal loan;

- approximately $187,000 to pay the salaries of other Firm employees; and

- approximately $29,000 to pay (i) American Express bills which included both business and personal expenses; and (ii) other restaurant and retail charges.

42.     Investor A received statements from the Funds' administrators which showed that his account had a purported capital account balance of between approximately $1.78 million and $2.07 million.  Because the Funds' NAV included the receivables and, beginning in 2016, the performance "true up," these amounts were materially inflated.  Investor A also received "Net Capital Account Summaries" prepared by L-R Managers for certain periods.  These summaries also contained materially inflated account values and returns.

## V.   Investor B – Misappropriation of Approximately $1.37 Million

43.   Between January 2013 and July 2014, LaGuardia misappropriated approximately $1.37 million which Investor B had designated as subscriptions into the offshore Frontier Fund.

44.   Specifically, in December 2012, LaGuardia emailed the PPM and subscription documents required for Investor B to invest in the offshore Frontier Fund.

45.   On January 22, 2013, Investor B, through a privately held entity, wired $800,000 to be invested in the offshore Frontier Fund.  In an email exchange, LaGuardia instructed Investor B to wire the money to an entity affiliated with the Firm called L-R Managers Investments, LP ("LRMI") and explained that LRMI would invest in the Frontier Fund on Investor B's behalf.  Of the $800,000 sent by Investor B to LRMI, $400,000 was invested in the offshore Frontier Fund purportedly in the name of LRMI.  Investor B's remaining $400,000 was used to pay unauthorized Firm and personal expenses as well as to make payments in connection with L-R entities and investments that were wholly unrelated to the Frontier Funds.  The unauthorized Firm expenses included rent, payroll, and direct payments to LaGuardia.  Personal expenses included thousands of dollars for restaurants, payments to a surf shop and purchases at upscale women's clothing stores.

46.   Of Investor B's $400,000 that was purportedly invested in the offshore Frontier Fund in the name of LRMI, LaGuardia misappropriated the majority of that money approximately a year later.  In a letter dated January 27, 2014, under the auspices of a "special redemption request," LaGuardia directed the fund administrator to waive the lock-up period and then withdrew $370,000 of Investor B's money from the account.  The money was transferred to the L-R Managers' account, and on January 29, 2014, $300,000 was used to pay for LaGuardia's personal home renovations.

47.     Investor B made a subsequent investment in the offshore Frontier Fund. Specifically, on May 15, 2014, LaGuardia sent Investor B subscription documents for the offshore Frontier Fund. On June 3, 2014, Investor B wired $600,000 as an additional investment in the offshore Frontier Fund. Again, LaGuardia instructed Investor B to wire the money to the LRMI account. This money was never invested in the Frontier Funds. Instead, throughout June and July of 2014, all but approximately $5,000 of Investor B's subscription money was transferred to the L-R Managers bank account which as of June 1, 2014, had a balance of less than $1,000. During this period, LaGuardia directed approximately $80,000 of this money to himself. Investor B's money was also spent on, among other things: office rent, groceries, rent for a New York City apartment, and approximately $35,000 in payments to American Express, which included both personal and Firm expenses. Investor B's money was also used to fund ATM withdrawals, event tickets, and retail purchases.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

48.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47 of this Complaint.

49.     By engaging in the acts and conduct alleged above, Defendant, directly or indirectly, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails and with scienter: (a) employed and/or is employing devices, schemes, or artifices to defraud; (b) obtained, and/or is obtaining, money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged, and/or is engaging, in

transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

50.     By reason of the foregoing, Defendant has violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
Violations of Section 10(b) of the Exchange Act and Rule 10b-5

51.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47 of this Complaint.

52.     By engaging in the acts and conduct alleged above, Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, with scienter: (a) employed, and/or is employing, devices, schemes, or artifices to defraud; (b) made, and/or is making, untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged, and/or is engaging, in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

53.     By reason of the foregoing, Defendant has violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
Violations of Sections 206(1) and 206(2) of the Advisers Act

54.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47 of this Complaint.

55.     Defendant directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, while acting as an investment adviser within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], has: (a) employed, and/or is employing, devices, schemes, and artifices to defraud a client or prospective client; and (b) engaged, and/or is engaging, in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

56.     By reason of the foregoing, Defendant violated, and unless enjoined will again violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**FOURTH CLAIM FOR RELIEF**
Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8

57.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47 of this Complaint.

58.     The Frontier Funds were pooled investment vehicles within the meaning of Rule 206(4)-8 of the Advisers Act, 17 C.F.R. § 275.206(4)-8.  Defendant directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, while acting as an investment adviser within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], to a pooled investment vehicle has: (a) made, and/or is making, an untrue statement of a material fact or to omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investor in pooled investment vehicles; and (b) engaged, and/or is engaging, in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors and prospective investors in pooled investment vehicles.

59.     By reason of the foregoing, Defendant has violated, and unless enjoined will again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder.

### FIFTH CLAIM FOR RELIEF
Control Person Liability for L-R Managers' Violations of Section 10(b)
of the Exchange Act and Rule 10b-5

60.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47 of this Complaint.

61.     L-R Managers, directly or indirectly, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, with scienter: (a) employed, and/or is employing, devices, schemes, or artifices to defraud; (b) made, and/or is making, untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged, and/or is engaging, in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

62.     By reason of the foregoing, L-R Managers singly or in concert, directly or indirectly, has violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

63.     At all times relevant hereto, LaGuardia was a controlling person of L-R Managers for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

64.     LaGuardia knowingly or recklessly engaged in fraudulent conduct that resulted in L-R Managers' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

65.     By reason of the foregoing, LaGuardia is liable as a controlling person pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for L-R Managers' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

A Final Judgment finding that the Defendant violated the securities laws and rules promulgated thereunder as alleged against him herein;

### II.

A Final Judgment permanently restraining and enjoining the Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### III.

A Final Judgment permanently restraining and enjoining the Defendant, and his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Advisers Act Sections 206(1), 206(2), and 206(4) [15

U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8]

thereunder;

### IV.

A Final Judgment directing the Defendant to disgorge his ill-gotten gains, plus

prejudgment interest;

### V.

A Final Judgment imposing civil money penalties upon Defendant pursuant to

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act

[15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(e) and 80b-

9(f); and

### VI.

Such other and further relief the Court deems just and proper.

## **JURY DEMAND**

The Commission hereby demands a trial by jury pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

Dated:       June 24, 2019
             New York, New York

By:            _____

Marc P. Berger
Sanjay Wadhwa
Judith Weinstock
Christopher J. Dunnigan
Alison Conn *
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0061 (Dunnigan)
Email: dunnigancj@sec.gov

* not admitted in the U.S. District Court for the
S.D.N.Y.